IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MATTHEW JACKSON,            )
                            )
       Plaintiff,       )
                            )
vs.                         )   Case No. 07-cv-0450-MJR-CJP
                            )
UNITED PARCEL SERVICE, INC., )
                            )
       Defendant.       )

MEMORANDUM AND ORDER

Reagan, District Judge:

**A.** **INTRODUCTION**

In June 2007, Matthew Jackson (an Illinois citizen who lives in Cumberland County, Illinois) filed suit in this Court against his former employer, United Parcel Service, Inc. (a Georgia corporation with its principal place of business in Atlanta). Jackson claimed that United Parcel Service ("UPS") discharged him from employment in retaliation for exercising rights afforded to him under the Illinois Workers' Compensation Act, 820 ILCS 305/1, *et seq.*

Alleging that he suffered loss of income, loss of benefits, emotional distress, embarrassment and humiliation as a result of the discharge, Jackson sought over $75,000 in compensatory damages plus punitive damages sufficient to deter UPS from engaging in such conduct in the future.

UPS answered, discovery proceeded, and deadlines were imposed.

The case is set for final pretrial conference October 17, 2008 with a settlement conference October 6, 2008 (*see* Docs. 5, 21). Now before the Court is UPS's summary judgment motion, which was fully briefed on September 15, 2008. For the reasons stated below, the Court grants the motion.

### B.  APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. ***Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008),** *citing* **Fed. R. Civ. P. 56(c),** ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and** ***Krieg v. Seybold*, 481 F.3d 512, 516 (7th Cir. 2007).** *Accord* ***Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519 (7th Cir. 2008).**

In ruling on a summary judgment motion, this Court must view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. ***TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007);** ***Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).**

However, the nonmovant "must present specific facts showing that there is a genuine issue for trial," ***Jordan v. Summers*, 205 F.3d 337, 247 (7th Cir. 2000).** And the Court can find a genuine issue of material fact "only if sufficient evidence favoring the nonmoving party exists [which would] permit a jury to return a verdict for that party." ***Argyropoulos v. City of Alton*, —**

**F.3d –, 2008 WL 3905891 (7th Cir. Aug. 26, 2008),** *quoting Sides v. City of Champaign*, **496 F.3d 820, 726 (7th Cir. 2007).** The Court now turns to the standards governing the Illinois tort of retaliatory discharge.[1]

To prevail on a claim of retaliatory discharge under Illinois law, the employee must demonstrate (1) that he has been discharged, (2) that the discharge was in retaliation for his activities, and (3) that the discharge violates a clear mandate of public policy. **Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992).** Thirty years ago, the Illinois Supreme Court held that a discharge in retaliation for the exercise of workers' compensation rights violates the public policy of Illinois. **Kelsay v. Motorola, 384 N.E.2d 353, 357-58 (Ill. 1978)("[R]etaliatory discharge is offensive to the public policy of this State…. [This] policy can only be effectively … enforced by allowing a civil remedy for damages.").**

Earlier this year, the United States Court of Appeals for the Seventh

---

[1] Jackson's complaint references the "strong public policy of the State of Illinois" and rights protected by the Illinois Workers' Compensation Act. The complaint invokes and this Court enjoys subject matter jurisdiction under the diversity statute. Jackson nowhere invokes federal question jurisdiction; the complaint makes no reference to Title VII or any federal law. The Court need not engage in analysis of federal retaliation standards under the *McDonnell Douglas* approach, instead focusing on the standards for Illinois retaliatory discharge claims. However, if this Court were to apply the federal burden-shifting approach to retaliation claims, Jackson would fare no better. He has no actual direct evidence of retaliation, and – under the indirect approach – he has shown neither that he was meeting UPS's legitimate expectations nor that UPS more favorably treated similarly situated employees who filed no workers' compensation claims.

Circuit thoroughly assessed what is needed for a retaliatory discharge claim based on the exercise of rights under the Illinois Workers' Compensation Act. In ***Dotson v. BRP U.S., Inc.*, 520 F.3d 703, 707 (7th Cir. 2008),** the Court clarified what the employee must establish for such a claim:

> "(1) that he was the defendant's employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim."

***Id.*, quoting *McCoy v. Maytag Corp.*, 495 F.3d 515, 521 (7th Cir. 2007), and *citing Carter v. Tennant Co.*, 383 F.3d 673, 677 (7th Cir. 2004).**

Bearing these standards in mind while considering the record before it, the Court addresses UPS's motion for summary judgment. As explained below, Jackson has satisfied the first two elements of this three-pronged formulation; the dispute centers on whether he has satisfied the third.

### C. ANALYSIS

Jackson worked for UPS from September 1, 1992 to January 15, 2007. Based at UPS's Mattoon, Illinois facility, Jackson delivered packages in Effingham, Clark, Coles and Cumberland Counties. In September 1999, Jackson suffered a work-related injury. Shortly thereafter, he filed a workers' compensation claim. UPS fired Jackson in January 2007. Jackson maintains the firing was retaliatory. UPS claims it had a valid basis for the discharge.

Jackson was a UPS employee, and he did exercise rights under the

Illinois Workers' Compensation Act. He has satisfied the first two elements of his burden of proof. Resolution of the issue before the Court turns on the third element – the existence of a causal link between Jackson's exercise of protected rights and his termination.

Jackson bears the burden of demonstrating that the termination was motivated by an unlawful intent to retaliate against him for exercising a statutory right to workers' compensation benefits. **See Dotson**, **520 F.3d at 707**, *citing Feldman v. American Memorial Life Ins. Co.*, **196 F.3d 783, 792 (7th Cir. 1999)**. And, critical to the case at bar, this "element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." **Id.**, *quoting Hartlein*, **601 N.E.2d at 728**.

The extensive record before the Court contains not only thorough briefs supporting and opposing UPS's motion but also excerpts from eight depositions (including Jackson's April 21, 2008 deposition), sworn declarations by the UPS managers involved in the decision to fire Jackson (Ron Phillips and Mark Collins) and materials from a UPS investigation following a customer (Jamie Elliott)'s complaints regarding Jackson's behavior in January 2007. Construed in the light most favorable to Jackson, the record reveals the following.

Jackson began working for UPS in September 1992. Originally, he worked as an unloader. Later he became a package car driver, delivering

packages from the Mattoon facility to customers' homes in a big brown truck.

Jackson's employment continued until January 15, 2007. During his time with the company, Jackson filed two workers' compensation claims. In 1993 or 1994, he filed a claim for a knee injury. In 1999, Jackson filed a claim based on an ankle injury. Jackson also sustained two minor work-related injuries at UPS (one in December 2000 and one in May 2005), but neither of those resulted in any time off work. As to the exercise of rights under the Illinois Workers' Compensation Act needed to support a retaliatory discharge claim, **Jackson relies on his 1999 workers' compensation claim**. *See, e.g.,* Complaint, Doc. 2, ¶¶ 7-12.

On January 10, 2007, when Jackson returned to the Mattoon facility at the end of his shift, he learned that a UPS customer (Jamie Elliott) had called to report that Jackson missed a pick-up at her business, "Elliott's Embroidery." Without authorization from UPS, Jackson drove in his personal car after work to pick up the packages.

At the conclusion of his shift the next day, January 11, 2007, Jackson was told by a clerk at the Mattoon facility – Pete Ferguson – that Mrs. Elliott had called to complain about Jackson's driving. Specifically, Mrs. Elliott complained that Jackson had left a seven-foot skid mark in her driveway.[2]

---

[2] Jackson had been to Elliott's Embroidery twice on January 11th (in the morning to deliver packages and later to pick up packages), before he learned of Mrs. Elliott's complaint (Jackson Depo., Exh. A to Doc. 17,

Jackson intended to apologize to Mrs. Elliott, because attempting to correct the situation was in keeping with his Christian beliefs and values. Additionally, Jackson knew Mrs. Elliott's husband, Brad, and thought "if they were still out in the shop … I'll swing by and … apologize if … anything I had done … offended them" (Jackson Depo., Exh. A to Doc. 17, p. 141).[3]

In his personal vehicle, with no packages to deliver or pick up, without UPS's permission, Jackson drove to Elliott Embroidery. It was dark out by this time. When he pulled his car into the driveway of the embroidery business, Jackson's headlights shone across the windows of the Elliotts' home, which was next door to their business. Once in the driveway, Jackson could tell "that no one was in the shop," but he saw someone looking out of a window of the Elliotts' residence (Jackson Depo., pp. 142-143).

In his UPS uniform, Jackson knocked on the door of the Elliotts' business but received no answer. He then walked to the door of the Elliotts' home and knocked. A girl answered and "hollered for her mom" (*id.*, p. 145). When Jackson began to try to apologize, Mrs. Elliott "expressed … that she didn't think it was professional" for him to be there in his personal vehicle or to be at her home at that time of night (*id.*, pp. 145-146).

---

      p. 140).

[3]   Jackson knew that UPS had a system for responding to customer complaints. This complaint was not processed through that system, and no one at UPS asked or authorized Jackson to personally apologize to Mrs. Elliott (*id.*, pp. 147-148).

Mrs. Elliott seemed anxious to Jackson (*id.*, p. 147, p. 150). As soon as Jackson left, Mrs. Elliott called the local sheriff.

After leaving the Elliotts' house, Jackson headed to his own home, where he told his wife about the encounter and described "Mrs. Elliott's response" (*id.*, p. 152). Shortly thereafter, Jackson received a phone call from Officer or Deputy David Pickering of the Coles County Sheriff's Department. Pickering advised Jackson that Mrs. Elliott had contacted his office upset by Jackson's appearance at her home. Pickering cautioned Jackson to not return to the Elliott property.

At 8:20 the next morning (January 12, 2007), an angry and agitated Mrs. Elliott phoned the Mattoon UPS facility, asked to speak to the person who assigned drivers to routes, and instructed UPS Supervisor Jason Vonderheide to make certain Jackson was never allowed to deliver packages to her home again. Indeed, Mrs. Elliott stated that if Jackson stepped on her property again, she would have him arrested (Vonderheide Depo., Exh. E to Doc. 17, p. 9).

Vonderheide reported Mrs. Elliott's call to Ronald Phillips, who at that time was the Business Manager of the UPS Mattoon facility. Phillips called his boss, Division Manager Jeff Gehron. Phillips also alerted UPS Security Manager Jim Johnson, Labor Manager Mark Collins and Employee Relations Manager Carlos Interial.

Phillips began an investigation of the incident, with the assistance of Dan Geiger, one of two full-time supervisors at the Mattoon facility.[4] During the course of the investigation, Phillips and Geiger met with Mrs. Elliott.

She recounted the events including the fact that she had asked Jackson to leave her property, that he would not do so initially, that he said he did not want to leave "until the matter was cleared up," and that she had asked him three times to go. Mrs. Elliott explained that her daughter had answered the door when Jackson showed up, that Mrs. Elliott then came to the door, that she stood inside her home while Jackson spoke to her from outside the storm door, that Jackson stepped toward the door frame and gestured with his hands, that he looked "rather upset," that she was intimidated or frightened by him, and that Jackson asked her to come outside and show him where the skid marks were that he allegedly left in her driveway.

Mrs. Elliott told Phillips and Geiger that she sternly told Jackson he was being unprofessional to show up at her house at that time of night, she offered to discuss the issue with someone other than Jackson at the UPS office the next day, and when Jackson again refused to leave, she shut and locked her door.

---

[4] Geiger was "on road supervisor" of the drivers and reported directly to Phillips. Vonderheide, the other full-time supervisor at the facility, dispatched drivers and reported to Phillips. Phillips Depo., Exh. C to Doc. 17, pp. 7-9.

Mrs. Elliott's brother pulled into her driveway just as Jackson was leaving, and he encouraged her to call the Sheriff's Department. *See* Phillips Depo., pp. 64-66; Phillips Declaration, Exh. B to Doc. 17 and attached documents.[5]

On January 15, 2007, Jackson was interviewed by Security Manager Johnson, in the presence of Business Manager Phillips and union steward Mike Kuncl. Jackson conceded that he had gone to Mrs. Elliott's residence after work in his UPS uniform to follow up on her complaint about his driving. Although Jackson maintained (and still maintains) that Mrs. Elliott never directly ordered him to leave her house, he admitted that she showed anxiety and told him it was unprofessional for him to be at her house at that hour (Jackson Depo., pp. 146, 154-155).

Based on the investigation of the January 11th incident, Phillips concluded that a UPS customer (Mrs. Elliott) had been concerned for her safety and that Jackson's actions had been inappropriate and unprofessional. Phillips further concluded that those actions constituted conduct unbecoming a UPS employee. Phillips consulted with Labor Manager Collins and – on January 15, 2007 – terminated Jackson for conduct unbecoming a UPS employee.

---

[5] Security Manager Johnson also interviewed Mrs. Elliott about the January 11th events, and Mrs. Elliott submitted a detailed written summary of those events (a copy of which was provided in the materials submitted with Doc. 17).

**At that time, neither Phillips nor Collins knew that Jackson had claimed workers' compensation benefits for the 1999 injury**.

Indeed, Phillips did not know of *any* workers' compensation *claim* filed by Jackson. The only *injury* Phillips knew of Jackson reporting was a minor ankle-twist that did not result in any missed work or any benefits claim. Similarly, at the time UPS fired Jackson, Collins did not know of any workers' compensation claims filed by Jackson.

When Phillips consulted Collins about discharging Jackson, Phillips had concluded (and Collins concurred) that Jackson had engaged in conduct unbecoming a UPS employee by going to a customer's home after work without permission and questioning her about a complaint she made against him, resulting in a call to the police. In his 22-year career with UPS, Phillips knew of no other situation in which a UPS customer felt so threatened by a UPS driver that she called the police. *See* Exhs. B, C and J to Doc. 17.

The record before this Court discloses no evidence of a causal link between Jackson's exercise of rights under the Illinois Workers' Compensation Act and his discharge. Significant time elapsed between Jackson's 1999 workers' compensation claim and his 2007 termination, and the key decision-makers lacked knowledge of his exercise of rights under the Act. No reasonable inference of retaliation can be drawn from this record.

Furthermore, even if Phillips and Collins had known about Jackson's workers' compensation claims at the time they fired him, and even if there were less than a seven-year gap between Jackson's protected activity and his discharge, the record plainly establishes that UPS had a <u>valid</u> basis to terminate Jackson's employment, and Jackson has not demonstrated that UPS's reason was pretextual.  The written summary Mrs. Elliott provided (which sets out her account of the January 11, 2007 encounter with Jackson) buttresses the information gleaned during the investigation, which undergirds the legitimate reason for UPS's termination of Jackson's employment.

In response to UPS's summary judgment motion and supporting materials, Jackson posits that Johnson's investigation of the Elliott incident was "duplicitous," shoddy, unfair and "poisoned" from the get-go by Phillips (Doc. 26, pp. 7-8, 12).  Jackson emphasizes that the police never prepared a formal report following Mrs. Elliott's call, and Mrs. Elliott never filed a criminal charge, suggesting the incident was not all that serious.

Jackson points to the fact that UPS kept records of work-related injuries suffered by employees and what those injuries cost the company. Jackson insists that UPS is hostile toward individuals hurt on the job and that UPS targeted him as an "injury repeater."  More specifically, Jackson notes that a UPS manager named Greg Bryant referred to him an "MIE" (most injured employee) in 1999 or 2000.

Jackson's arguments are unavailing. The record is devoid of evidence to support most of these assertions, and the few assertions with any support fail to satisfy Jackson's burden of proving a causal connection between his 1999 workers' compensation claim and his 2007 firing.

For instance, whether or not Mrs. Elliott pressed formal charges against Jackson or over-reacted to Jackson's attempt to apologize in person, the uncontroverted record establishes (and Jackson admits) that he did go to the Elliotts' home in his uniform, at dark, after hours, in his personal car, knocked on the door, directly confronted Mrs. Elliott about her complaint regarding his driving, and caused her anxiety, after which she called the sheriff and asked UPS to never let him near her property again.

Those who made the decision to fire Jackson – including Ron Phillips, Business Manager of the Mattoon facility from March 2003 through October 2007, and Mark Collins, Labor Manager for the District encompassing the Mattoon facility – knew nothing about Jackson filing a workers' compensation claim in 1999 (or earlier, in 1993/1994) and did not consider him to be an injury "repeater" (*see, e.g.,* Phillips Depo., p. 30; Collins Decl., p. ¶ 7).

During his entire career with UPS, Collins was never asked to target injury repeaters for termination (Collins Decl., ¶ 8). Neither were Phillips, Bryant, or the other managers/supervisors involved in the decision to discharge Jackson (*see* Exhibits to Doc. 17).

The parties debate whether Phillips (at some point after Jackson was discharged) bragged about the firing. Phillips flatly denies any such statement (*see* sworn declaration at Doc. 27-8, ¶ 5). To back up his allegation, Jackson submitted <u>unsigned</u> copies of affidavits from UPS employees Jason Russell and Levi Collins with his brief opposing summary judgment (Docs. 26-7 & 26-8).[6] But as of the date this Order was drafted, those unsigned affidavits had not been replaced with signed documents (even after defense counsel drew attention to the fact in a September 15, 2008 reply brief at Doc. 27). So the Court cannot properly consider them.

Having carefully reviewed the copious materials and construed the evidence and reasonable inferences in the light most favorable to Jackson, the Court finds as follows.

A reasonable jury could conclude that Jackson's purpose in driving to Mrs. Elliott's the night of January 11, 2007 was to apologize for having offended her the day before. A reasonable jury could fully credit Jackson's Christian values as the intention for the trip. But the uncontroverted evidence shows that the visit was not authorized by UPS, that it alarmed Mrs. Elliott enough for her to call both UPS and the police, and that UPS conducted an

---

[6] The two unsigned, un-notarized affidavits contain an identically-worded single sentence stating that shortly after Jackson's discharge, the affiant heard Phillips "boast words to the effect that he (Phillips) was able to bring about the termination of Matt Jackson's employment" when a prior manager had not done so.

investigation into the matter, including an in-person meeting with Mrs. Elliott and an interview of Jackson (in which he corroborated key details of Mrs. Elliott's account).  **A reasonable jury could *not* conclude that Jackson's discharge was due to retaliation.**

Put simply, Jackson has not satisfied his burden on the third prong of the retaliatory discharge cause of action – showing that UPS's 2007 termination of his employment was causally connected to his 1999 filing of a workers' compensation claim.

### D. Conclusion

For the reasons stated above, no genuine issues of material fact remain, and UPS is entitled to judgment as a matter of law.

**Accordingly, the Court GRANTS UPS's motion (Doc. 15), DIRECTS the Clerk of Court to enter judgment in favor of Defendant UPS and against Plaintiff Jackson, and CANCELS all settings herein.**

IT IS SO ORDERED.

DATED this 25th day of September 2008.

s/Michael J. Reagan
Michael J. Reagan
United States District Court
